# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **PAUL ALEXANDER BLAIS**, *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 02-285 (RCL)** |
| ) | |
| **ISLAMIC REPUBLIC OF IRAN**, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

## BACKGROUND

These actions arise from the June 25, 1996 bombing at Khobar Towers, a residence on a United States military base in Dhahran, Saudi Arabia.  Plaintiffs allege that the Islamic Republic of Iran ("Iran"), the Iranian Minister of Intelligence and Security ("MOIS"), and the Iranian Islamic Revolutionary Guard Corp ("IRGC" or "the Pasdaran") are liable for damages from the attack because they provided material support and assistance to Hezbollah, the terrorist organization that orchestrated and carried out the bombing.[1]  Plaintiffs have relied upon causes of action founded upon provisions of the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7).

## PROCEDURAL HISTORY

On February 13, 2002, plaintiffs filed their original complaint seeking redress for their losses under FSIA.  On October 1, 2002, Plaintiffs filed an amended complaint adding plaintiffs

---

[1] At other points during the case, plaintiffs sought redress for their losses from various other defendants who have since been dismissed from the case.

Curtis A. Taylor and Maria Taylor, and Thaddeus Fenning.[2]  On January 29, 2003, return of

service of summons and complaint on defendants Iran, MOIS and the IRGC was executed on

January 13, 2003.  Later in the year, on July 22, 2003, plaintiffs filed a second amended

complaint, which was served on defendants via diplomatic channels on February 2, 2004, with an

Answer due February 23, 2004.  After defendants failed to respond, default was entered against

them on July 29, 2004.

On January 12, 2005, in light of recent decisions by the Court of Appeals for this Circuit,

this Court subsequently denied Entry of Default against defendants.  After an Order of this Court

directing plaintiffs to show cause why the complaint should not be dismissed as to those named

defendants who had not yet been served at that time, this Court entered an Order dismissing the

complaint without prejudice as to defendants Hizballah, Ayatollah Ali Hoseini Khamenei, Ali

Akbar Mohtashemi, Osama Bin Laden, and Ali Akbar Hashemi-Rafsanjani.

Plaintiffs subsequently filed their third amended complaint against the remaining three

defendants: Iran, MOIS, and the IRGC.[3]  As compared to the initial complaint, the third amended

complaint served to put the remaining defendants on notice that the claims sought by plaintiffs

were grounded in state substantive law as well as in the federal statutory scheme.  It also sought

redress from only those three defendants who had been served.  Even were these changes

characterized as substantive Iran, the MOIS and the IRGC had fair notice of the allegations and

relief sought, because the changes to the third amended complaint were not substantial.  *See*

*Dammarell v. Islamic Republic of Iran*, 370 F. Supp. 2d 218, 225 (D.D.C. 2005) (Bates, J.)

(noting that only "additions to a complaint [which are] substantial" might warrant the service of

---

[2] Mr. Fenning was subsequently dismissed without prejudice as a party on May 5, 2003.

[3] The Third Amended Complaint was officially entered onto the docket on May 26, 2006.

an amended complaint).   Accordingly, this Court will not require plaintiff to serve the amended

complaint.   Based on all of the evidence presented, the Court makes the following findings of

fact and conclusions of law and will, consistent with them, enter default judgment in favor of

plaintiffs and against defendants Iran, MOIS, and the IRGC.

## FINDINGS OF FACT

1.      Plaintiff Paul Blais was born on June 24, 1970, and had just celebrated his 26th birthday

the day before the attack on the Khobar Towers.  He was and is a United States citizen,

and resides today in Hampton, Virginia, in the same house as his parents, Curtis and

Maria Taylor.  Tr. 101-02; 110.[4]

2.      Mr. Blais had served about four and a half years in the United States Air Force after

enlisting in October 1991.  Tr. 104.  He was stationed at Patrick Air Force Base in Cocoa

Beach Florida when he was sent to perform a ninety day rotation of duty in Saudi Arabia.

Tr. 107-08.  He was trained and served as an airborne search and rescue coordinator who

had the responsibility to coordinate and direct the recovery efforts for any downed air

crew members.  Tr. 106.

3.      He was assigned as a permanent member of an aircrew that included four other airmen,

all with specialized and well-defined duties.  Tr. 108-09.

4.      The United States military presence in Saudi Arabia was with the consent of that host

country.  Ex. 14 at 3.  It was part of a coalition of forces, primarily from the United

States, Great Britain, and France, that was charged with monitoring Iraq's compliance

with United Nations Security Council resolutions enforcing the cease-fire that had

_____

[4] References to the transcript of the hearing held on May 26, 2006, will be abbreviated
throughout as "Tr. _."  References to exhibits admitted into evidence at the hearing will be
abbreviated "Ex. _."

brought an end to the 1991 "Desert Storm" ejection of Iraqi occupying forces from Kuwait. *Id.* at 3-4; Tr. at 40-41.

5.   The deployment of U.S. troops to the region was considered a peacetime deployment within a friendly host country. Tr. at 42-43. Blais's unit engaged in routine peace time operations, such as practice runs and transfer of personnel. Tr. at 111.

6.   Blais held a pilot's license and had amassed sufficient flying time to qualify for certification as a commercial pilot. Tr. 104, Ex. 20. He was ready to take the commercial flying certification examinations. Tr. 104, 99.

7.   From his earliest days that he could remember, Blais had always wanted to be an airline pilot. Tr. 104; 98-99. He loved flying and joined the Air Force because of his love of flying. Tr. 104.

8.   As a young man, he had been active, athletic, and popular, with many friends and an active social life. Tr. 139, 118. He was an accomplished skier and snowboarder, and enjoyed many other active and demanding sports as well. Tr. 103, 98.

9.   He had worked as a radio announcer throughout his late teens and prior to enlisting with the Air Force. He had a "radio-quality" voice. Tr. 98.

10.  Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) continuously since January 19, 1984." *Flatow v. Islamic Republic of Iran*, 999 F. Supp.1, 11, (D.D.C. 1998) (Lamberth, J.).

11.  Defendant the IRGC is a non-traditional instrumentality of Iran. It is the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran. It is similar to the Nazi party's SA organization prior to World War II.

The IRGC actively supports terrorism as a means of protecting the Islamic revolution that brought the Ayatollah to power in Iran in 1979.  It has its own separate funding sources, derived from confiscation of the assets of the former Shah of Iran in 1979, when the Shah was deposed.  Tr. 15-17; Ex. 11.

12.    The Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces charged with monitoring compliance with U.N. security council resolutions.  Tr. 41.

*The Attack on the Khobar Towers*

13.    At approximately 10 minutes before 10 pm on June 25, 1996, a large gasoline tanker truck pulled up alongside the perimeter wall of the Khobar Towers complex.  The driver jumped out, ran into a waiting car that had pulled up near the truck, and sped off.  Tr. 9-10.

14.    Although security guards near the top of Building 131 started to give warnings about the unusual vehicle location, the truck exploded with great force within about 15 minutes. The investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT.  The Defense Department said that it was the largest non-nuclear explosion ever up to that time.  Tr. 10.

15.    The explosion sheared off the face of Building 131, where Paul Blais and his crewmates were housed, and reduced most of it to rubble.  Nineteen United States Air Force personnel were killed in the explosion, and hundreds of others were injured.  Tr. 11; Ex. 2.

*Iranian Support and Sponsorship of the Attack*

16.    The attack was carried out by individuals recruited principally by a senior official of the

IRGC, Brigadier General Ahmed Sharifi. Sharifi, who was the operational commander, planned the operation and recruited individuals for the operation at the Iranian embassy in Damascus, Syria.  He provided the passports, the paperwork, and the funds for the individuals who carried out the attack.  Tr. 12-13; Ex. 13.

17. The truck bomb was assembled at a terrorist base in the Bekaa Valley which was jointly operated by the IRGC and by the terrorist organization known as Hezbollah.  Tr. 13.  The individuals recruited to carry out the bombing referred to themselves as "Saudi Hezbollah," and they drove the truck bomb from its assembly point in the Bekaa Valley to Dhahran, Saudi Arabia.  *Id.*

18. The terrorist attack on the Khobar Towers was approved by Ayatollah Khameini, the Supreme leader of Iran at the time.  Tr. 13-14.  It was also approved and supported by the Iranian Minister of Intelligence and Security ("MOIS") at the time, Ali Fallahian, who was involved in providing intelligence security support for the operation.  Tr. 14.  Fallahian's representative in Damascus, a man named Nurani, also provided support for the operation.  *Id.*

19. Under Louis Freeh, the FBI conducted a massive and thorough investigation of the attack, using over 250 agents.  Ex. 4 at 37.

20. Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment on June 21, 2001, against 13 identified members of the pro-Iran Saudi Hezballah organization.  The indictment's description of the plot to bomb the Khobar Towers complex frequently refers to direction and assistance from Iranian government officials.  Tr. 25-26; Exs. 7, 7A.

21. Louis Freeh has publicly and unequivocally stated his firm conclusion, based on evidence

gathered by the FBI during their five-year investigation, that Iran was responsible for planning and supporting the Khobar Towers attack.  Ex. 3 at 16; Exs. 5,6; Tr. at 19-20, 23.

22. Dale Watson was formerly the deputy counterterrorism chief of the FBI in 1996, and subsequently became the section chief for all international terrorism in 1997.  Mr. Watson was responsible for day to day oversight of the FBI investigation of the Khobar Towers attack.  Mr. Watson has given sworn testimony that information uncovered in the investigation, "clearly pointed to the fact that there was Iran MOIS and IRGC involvement in the bombing." Ex. 4 , at 42; *see also id.* at 48-49.

23. Dr. Bruce Tefft was one of the founding members of the CIA's counterterrorism bureau in 1985.  Tr. 6.  He served in the CIA until 1995, and has continued to work as a consultant on terrorism since that time, including work as an unofficial adviser to the New York Police Department's counterterrorism and intelligence divisions.  *Id.*  He retains a top-secret security clearance in connection with his work.  *Id.*  He has been qualified as an expert witness in numerous other cases involving Iranian sponsorship of terrorism.  Ex. 1 at 3.  He was qualified as an expert witness on terrorism in this case.  Tr. 8.

24. Dr. Tefft expressed the opinion that defendants the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on the Khobar Towers, including providing operational and financial support.  He stated that there was "no question about it. It wouldn't have happened without Iranian support.." Tr. 43.

25. Dr. Tefft based his conclusion on publicly available sources that were not inconsistent

with classified information known to him from his time at the CIA and from his security

clearances since that time.  He relied on the public sources described above, as well as

several others, which he described as authoritative and reliable, including congressional

testimony by Matthew Levitt, senior fellow and director of the Washington Institute's

Terrorism Studies Program, and articles published by the Federation of American

Scientists as well as the Free Muslims Coalition. Exs. 8, 11, 12; Tr. 28-29, 31-33.

*Injuries Sustained by Paul Blais*

26.    Blais had gone to bed early on the night of the attack because he had planned to get up at

4:00 am to get ready for an early morning flight mission.  He woke just before 10:05 pm

to use the bathroom, where he was when the explosion occurred.  Tr. 112.

27.    Blais' aircrew consisted of four other men: Pilot and Command Captain Chris Evans;

Flight Engineer Kevin Johnson; Navigator Leland Hahn; Loadmaster Justin Wood; and

Loadmaster Mike Heiser. All died as a result of injuries received in the explosion.  Tr.

108-09.

28.    The whole front of Blais' apartment building was shorn off.  Ex. 2.  After the explosion,

rescue personnel found him in the rubble, barely alive and unconscious.

29.    After Blais was found, he was removed from the rubble and taken to the nearest Saudi

hospital.  He was admitted and treated there for three or four days before he was even

identified.  Tr. 46.  On admission, his pulse was barely palpable, and he was experiencing

respiratory distress.  Tr. 48; Ex. 16 at 1.  Hospital personnel noted an extensive scalp

laceration and numerous other lacerations to his lower extremities.  Ex. 16 at 2.  He was

given a Glasgow coma scale of eight, a figure that typically reflects only a fifty percent

chance of survival for patients in that state of impaired consciousness and injury to the

brain.  Tr. 47-48; Ex. 16 at 2.  A tracheotomy was performed to safeguard his airway and

to allow ventilatory assistance for his breathing.  Ex. 16 at 2.

30.    Hospital records showed that he had suffered severe brain trauma, and he had also

suffered from deprivation of oxygen.  His brain trauma extended to areas of the brain that

controlled basic bodily functions.  Tr. 49.

31.    After he was identified, Blais was airlifted and transferred to Landstuhl Medical Center in

Germany, a United States military hospital.  Tr. 46-47.  There he received intensive

supportive care.  Ex. 16 at 2.  He was treated at Landstuhl for ten days, and his parents

were allowed to visit him there.  Tr. 48, 86.  He was then airlifted and transferred to the

Walter Reed Army Medical Center in the District of Columbia.  Tr. 47.

32.    The examining physician at Walter Reed diagnosed Blais as having severe axonal brain

injury, anoxic brain injury, and organic encephalopathy.  The examining physician

reported that Blais was in a persistent vegetative state, and that he required a tracheotomy

for respiratory function and a feeding tube for nourishment.  Blais showed no signs of

communication, spontaneous or otherwise, and needed constant supervision and total

assistance with any activities of daily living.  Ex. 16 at 2.

33.    After about three more weeks of treatment at Walter Reed, Blais was transferred to the

James A. Haley Veterans' Hospital in Tampa, Florida.  *Id.*  He began to come out of his

vegetative state there, about five weeks after his initial injury.  *Id.*  He was not discharged

from James A. Haley until October 22, 1996, and even then had to return daily for

outpatient care.  Tr. 47; Ex. 16 at 2.

34.    Blais' medical record contains descriptions of significant depression, several suicide

attempts in the early years after his injury, post-traumatic stress disorder, and survivor's

guilt, which he still feels today.  Ex. 16 at 2.  He has continuing nightmares and flashbacks, despite treatment. *Id*.

35.   In summary, Mr. Blais was hospitalized for approximately four months, from June 26 through October 22, 1996.  He was in a coma, then, a vegetative state for approximately five weeks.  He received intensive rehabilitation care for another six months after his discharge from full time hospitalization.  He has continued to receive medical treatment and rehabilitation and other therapies through the Veterans' Administration hospital system to this day.  Ex. 16 at 2.

36.   Dr. Erik Kobylarz, an Assistant Professor of Neurology at the Weill Medical College of Cornell University, was qualified as an expert witness in neurology and brain injury.  Tr. 46.  He testified about his neurological examination of Paul Blais and his review of Blais' medical records.

37.   Dr Kobylarz's neurological examination of Blais just prior to trial showed that even now, nearly 10 years after his injuries, Mr. Blais continued to have profoundly impaired and unstable ambulation, lack of coordination, and moderate right leg weakness.  Mr. Blais' short term memory exhibited continued impairment, and his writing and reading were very labored and slow. His optic nerves showed signs of significant atrophy.  Ex. 16 at 3; Tr. 52.

38.   Dr. Kobylarz expressed the opinion that Paul Blais suffered severe and extensive brain injury as a result of the bomb blast at the Khobar Towers complex on June 25, 1996.  Tr. 51, 58-59; Ex. 16 at 3.  The brain injury adversely affected nearly all elements of his life and ability to function.  Although Blais has made remarkable progress in the ten years since the injury, his ability to manage the functions of daily living remains limited.  Ex.

16 at 3.  He has continuing problems with speech, balance, coordination and tolerance for frustration and impulse control. He has moderate cognitive impairment.  *Id.*; Tr. 57-58.

39.    Dr. Kobylarz testified that Blais prognosis remains guarded, and that patients with brain injuries such as his often are afflicted with other neurologic problems, including seizures and psychiatric illnesses, many years after the original injury.  Ex. 16 at 3.

40.    Dr. Kobylarz expressed the opinion that, given Blais' continuing problems and deficits, it was unlikely that he could live a fully independent life again, or that he would be able to hold meaningful gainful employment for any extended period.  Ex. 16 at 4; Tr. 60.

41.    Dr. Kobylarz stated that the degree of progress that Blais has made can in large part be attributed to the care and concern he received from, and interaction he enjoyed with, his parents, who were physically with him throughout his rehabilitation and stimulated him to improve his functioning from the first weeks after his injury to this day.  Tr. 57-58; Ex. 16 at 3.

42.    Blais was given an honorable medical discharge from the Air Force in October 1996.  He had served 4 years and 10 months at that time.

43.    Blais has been receiving Social Security Disability benefits continuously since December 1996.  He has been rated as 100 percent disabled throughout that time.  Ex. 18; Tr. 121, 95.

44.    Blais has also been receiving disability payments from the Veterans' Administration, which has also rated him as 100 percent disabled.  Ex. 17; Tr. 96-97.

45.    The Court heard expert testimony from forensic economist Dr. Jerome Paige on estimated lost earnings suffered by Blais as a result of his brain injury.  Tr. 65-79.  Dr. Paige testified that, had Blais been able to conclude his military career as he planned and

become a commercial pilot upon leaving the military, and remained as a commercial pilot (but not an airline pilot) throughout his full expected worklife, he would have earned $3,455,750, or $1,801,792, discounted to present value.  Tr. at 74; Ex. 24 at 1.  Dr. Paige also testified that, had Blais left the military and immediately secured a job as a much higher paid airline pilot, his total expected earnings would have been $8,755,070 or $4,455,277 discounted to present value.  Tr. at 75, Ex. 24 at 1.

*Curtis and Maria Taylor*

46.   Curtis Taylor was Paul Blais's stepfather from the time he married Maria Taylor when Paul was only six.  Tr. at 79.  He was close to Paul and thought of him as his son, and Paul came to love him as his "real" father.  Tr. 80, 129.

47.   Both Curtis and Maria Taylor suffered intense, immediate, and continuing emotional distress when they learned that their son Paul had been a victim of the terrorist attack at the Khobar Towers.  Tr. 132, 82, 84.

48.   Their distress was heightened by the fact that, for three days after they first heard of the attack, they could obtain no information from the military authorities other than that Paul was "unaccounted for."  This was because he was unidentified at a Saudi hospital for those three days.  Tr. 84-85.

49.   In the absence of any information, Mr. and Mrs. Taylor came to believe that Paul had been killed.  This was because other missing servicemen who had been initially listed as "unaccounted for"came off that list as their bodies were identified upon return to Dover Air Force base.  Mr. and Mrs. Taylor logically concluded that Paul Blais would also be reported as killed once his remains were identified at Dover.  Tr. 84-85; 132.

50.   As the days passed, Mr. and Mrs. Taylor became convinced that Paul would be identified

among the dead, and they made preparations for purchasing a cemetery plot for him and for buying clothes for his funeral. Indeed, one local newspaper reported him as dead. Tr. 85; 132-33.

51.   It was only on the fourth day that they got word that Paul had been identified and was still alive at a Saudi hospital. Tr. 85.

52.   Their relief and happiness soon turned into anxiety and distress again when they realized how seriously injured he was. They flew to be at his side in Landstuhl, Germany, and were deeply emotionally affected again when they saw his condition, with numerous tubes and hospital apparatus attached to him, keeping him alive. Tr. 86-88; 134-35.

53.   Mr. Taylor left a good job with attractive benefits in Hampton, Virginia so that he and Mrs. Taylor could be at Paul's side throughout the long rehabilitation process in Tampa, Florida, and later in Tarboro, North Carolina. Tr. 89, 100. When they rented Paul a separate apartment in Tarboro next to theirs, they took turns sleeping on the floor in his apartment because Paul's insistent nightmares often caused him to scream in the middle of the night and wake up neighbors, who complained. Tr. 92.

54.   Throughout the ten years since Paul's injury, Mrs. Taylor has hardly left his side. She has been Paul's primary caretaker and constant nurse. Tr. 124, 135. She is still grieving for the loss of the vibrant, active young man with so much promise that Paul had been before his brain injury. Tr. 139.

55.   Both Mr. and Mrs. Taylor suffered profound emotional distress as a result of the injuries sustained by their son Paul. Tr. 100; 124-25; 143-44; 145. This was an intended consequence of the terrorist attack. Tr. 38-40. The terrorists' purpose is to inflict pain and suffering on the victims of their attack, and on the family members of those victims,

so that those victims and family member swill exert pressure on the United States

government to change its policies in ways beneficial to the terrorists' cause (in this case,

to cause the United States to withdraw its military presence from Saudi Arabia).  Tr. 38-

40.

56.     Although Paul survived the attack, he was never the same vibrant and promising young

man he had been before.  Tr. 139.  Both Mr. and Mrs. Taylor therefore also suffered the

deprivation of the company, society, and support that a healthy son normally confers on

close and well loved parents.

## CONCLUSIONS OF LAW

I.      *Legal Standard for FSIA Default Judgment*

Under the Foreign Sovereign Immunities Act, "[n]o judgement by default shall be entered

by a court of the United States or of a state against a foreign state . . . unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e);

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003), *cert. denied*, 542

U.S. 915 (2004).  In default judgment cases, plaintiffs may present evidence in the form of

affidavits.  *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. Mar. 29, 2006)

(quoting *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003)

(Urbina, J.)).  Upon evaluation, the court may accept plaintiffs' uncontroverted evidence as true.

*Campuzano*, 281 F. Supp. 2d at 268.

II.     *Jurisdiction*

In the United States, the Foreign Sovereign Immunities Act provides the sole basis for

asserting jurisdiction over foreign sovereigns.  *Argentine Republic v. Amerada Hess Shipping

Corp.*, 488 U.S. 428, 434-34 (1989).  Normally, a party may not bring an action for money

damages in U.S. courts against a foreign state.  28 U.S.C. § 1604.  The "state-sponsored

terrorism" exception, however, removes a foreign state's immunity to suits for money damages

brought in U.S. courts where plaintiffs are seeking damages against the foreign state for personal

injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage

taking, or the provision of material support or resources (as defined in section 2339A of title 18)

for such an act if such act or provision of material support is engaged by an official, employee, or

agent of such foreign state while acting within the scope of his or her office, employment or

agency."  28 U.S.C. § 1605(a)(7).

In order to subject a foreign sovereign to suit under section 1605(a)(7), plaintiffs must

show that: (1) the foreign sovereign was designated by the State Department as a "state sponsor

of terrorism"; (2) the victim or plaintiff was a U.S. national at the time the acts took place; and

(3) the foreign sovereign engaged in conduct that falls within the ambit of the statute.  *Prevatt v.

Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28, 2006) (Lamberth, J.).

Each of the requirements are met in this case.  First, Defendant Iran has been designated a

state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time

of the attack.  *See* 31 C.F.R. § 596.201 (2001); *Flatow*, 999 F. Supp. at 11, ¶ 19.  Second, the

victim, Paul Blais, was a United States national at the time of the attack.  Finally, defendant

Iran's support of an entity that committed an extrajudicial killing squarely falls within the ambit

of the statute.  Defendants MOIS and the IRGC are considered to be a division of state of Iran,

and thus the same determinations apply to its conduct.  *Roeder*, 333 F.3d at 234; *see also Salazar

v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116 (D.D.C. 2005) (Bates, J.) (analogizing the

IRGC to the MOIS for purposes of liability, and concluding that both must be treated as the state

of Iran itself).[5]

Personal jurisdiction over a non-immune sovereign exists so long as service of process has been made under section 1608 of the FSIA.  *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.).  In this case, such service has been made. Accordingly, this Court has *in personam* jurisdiction over defendants Iran, MOIS, and IRGC.

III.     *Liability*

       A.       *Proper Causes of Action Under the FSIA*

Once a foreign state's immunity has been lifted under Section 1605 and jurisdiction is proper, Section 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law.  *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates, J.) [hereinafter *Dammarell II*] .

In this case, state law provides a basis for liability.  First, the law of the United States applies rather than the law of the place of the tort or any other foreign law because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens.  *See Dammarell II*, 2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS 5343, at *63.

Second, having established that the laws of the United States apply in this action, the Court must determine the applicable state law to govern the action.  Here, the laws of Florida

_____

[5] Like the IRGC, the MOIS has been deemed "as the state of Iran itself," thereby subjecting the MOIS to the same determinations of liability as the state of Iran.  *Roeder*, 333 F.3d at 234.

govern the claims brought by plaintiff Paul A. Blais, while the laws of the Commonwealth of

Virginia govern the claims brought by plaintiffs Curtis and Maria Taylor.  As the forum state,

District of Columbia choice of law rules apply to determine which state's law shall apply.  Under

District of Columbia choice of law rules, courts employ a modified government interest analysis

under which they "evaluate the governmental policies underlying the applicable laws and

determine which jurisdiction's policy would be most advanced by having its law applied to the

facts of the case under review." *Hercules & Co. V. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C.

1989) (citations and internal quotations omitted).  Generally, application of this governmental

interest test points to the law of plaintiff's domicile   as having the greatest interest in providing

redress to its citizens.  *See Dammarell II*, 2005 WL 756090, at *20-21, 2005 U.S. Dist. LEXIS

5343, at *66-67 (citing RESTATEMENT (THIRD) FOREIGN RELATIONS LAW § 402(3) (1987)).

Accordingly, the claims of plaintiff Paul A. Blais shall be governed by his domicile at the time of

the attack, Florida.[6]  The claims of plaintiffs Curtis A. Taylor and Maria Taylor shall be governed

be their domicile at the time of attack, Virginia.

Third, as required by 28 U.S.C. § 1606, Florida and Virginia provide a cause of action

against private individuals for the kind of acts that defendants allegedly committed.  Plaintiffs

seek damages for battery and intentional infliction of emotional distress, both torts for which

private individuals may face liability.  The Court's next task is to determine whether plaintiffs

---

[6]  Plaintiffs have posited that Virginia law should govern the matter for each plaintiff because each is a domiciliary of Virginia at the time of the cause of action.  *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law, at 15-16.  The authority in this jurisdiction, however, holds to the contrary.  In choice of law issues, the proper governing law is the law of the state where the plaintiff was domiciled *at the time of the injury*, not the law of domicile at the time the action was filed.  *See Dammarell II*, 2005 WL 756090, at *22, 2005 U.S. Dist. LEXIS 5343, at *70-71 (noting that the state of domicile for plaintiffs who have moved at least once since an embassy attack "should be assessed as of the date that the embassy bombing occurred").

have demonstrated defendants' liability and their right to damages under the laws of Florida and Virginia.

B.      *Vicarious Liability*

The purported basis of defendants' liability is that they provided material support and resources to Hizbollah, the organization that personally completed the attack. A party may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting, and inducement. This Court finds that civil conspiracy provides a basis of liability for defendants Iran, MOIS, and IRGC.

1.      *Florida*

A civil conspiracy exists under Florida law where there is "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Walters v. Blankenship*, 931 So.2d 137 (Fla. Dist. Ct. App. Apr. 28, 2006). "The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Liappas v. Augoustis*, 47 So.2d 582 (Fla. 1950). "The existence of a conspiracy can be inferred from the conduct of the participants or from circumstantial evidence." *Robinson v. State*, 610 So.2d 1288, 1289-90 (Fla. 1992).

As this Court has previously held, "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Flatow*, 999 F. Supp. At 27. It is undisputed that Saudi Hezbollah committed the attack on the Khobar Towers.

In addition, it has been established by evidence satisfactory to this Court that Saudi Hezbollah and defendants Iran, MOIS and the IRGC conspired to commit the terrorist attack on

the Khobar Towers.  The evidence shows that senior Iranian, MOIS and IRGC officials participated in the planning of, and provided material support and resources to Saudi Hezbollah for the attack on the Khobar Towers, including providing financing, training and travel documents to facilitate the attacks.  The evidence also shows that Saudi Hezbollah, Iran, MOIS and the IRGC reached an understanding to do an unlawful act, namely the murder and maiming of American servicemen.  Moreover, the sheer gravity and nature of the attack demonstrate that the defendants also intended to inflict severe emotional distress upon the American servicemen as well as their close relatives.  The financing, training and providing of travel documents ably satisfy the overt act requirement for civil conspiracy under Florida law.  Finally, plaintiff Paul A. Blais has clearly suffered damage as a result of the conspiracy.  Accordingly, the elements of civil conspiracy are established between Saudi Hezbollah and the defendants Iran, MOIS and the IRGC.

      *2.*    *Virginia*

Civil conspiracy under Virginia law "is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose. . . ."  *Hechler Chevrolet, Inc. v. General Motors Corp.*, 337 S.E. 2d 744, 748 (Va. 1985).  Similar to Florida law of civil conspiracy, in Virginia the basis for an action of civil conspiracy "is the wrong which is done under the conspiracy and which results in damage to the plaintiff."  *Gallop v. Sharp*, 19 S.E.2d 84, 86 (Va. 1942).  Accordingly, the elements of civil conspiracy under Virginia law are subsumed within the elements of the same doctrine under Florida law.

In this case, the elements of civil conspiracy between Iran, MOIS, the IRGC and Saudi Hezbollah have been satisfied under Florida law.  Therefore, for the reasons noted above, the elements of civil conspiracy under Virginia law have also been established.

C.      *Plaintiff Paul A. Blais' Claims*

1.      *Battery*

Plaintiff Paul A. Blais first brings a claim for battery.  Under Florida law, the tort of

battery is "the infliction of a harmful or offensive contact upon another with the intent to cause

such contact or the apprehension that such contact is imminent."  *Quilling v. Price*, 894 So.2d

1061, 1063 (Fla. Dist. Ct. App. 2005).   The contact with the plaintiff is tortious if it is offensive

to the plaintiff, notwithstanding the severity of the contact.  *Paul v. Holbrook*, 696 So.2d 1311

(Fla. Dist. Ct. App. 1997) (quoting PROSSER AND KEETON ON TORTS § 9 (5th ed.1984)).

Moreover, this Court has previously held that an explosion caused by a suicide bomber on a bus

was a battery.  *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 69-70 (D.D.C. Mar. 24,

2006) (Lamberth, J.).

Here, Mr. Blais unquestionably experienced harmful and offensive contact in the forms of

the shockwaves of the explosion created by defendants' co-conspirators, and the physical contact

of the rubble from the Khobar Towers building that fell upon him as a result of the explosion.

Accordingly, defendants Iran, MOIS, and the IRGC are liable for battery under the theory of

vicarious liability.

2.      *Intentional Infliction of Emotional Distress*

Mr. Blais next brings a claim for intentional infliction of emotional distress.  Florida

courts have adopted Section 46, RESTATEMENT (SECOND) OF TORTS (1965) as the definition of

the tort of intentional infliction of emotional distress.  *Metropolitan Life Ins. Co. v. McCarson*,

467 So.2d 277, 278-79 (Fla. 1985).  Specifically, under Florida law, a defendant is liable for

intentional infliction of emotional distress if the defendant's "extreme and outrageous conduct

intentionally or recklessly causes severe emotional distress to another . . . ."  *Id.* (quoting

Restatement (Second) of Torts § 46(1) (1965)).

In evaluating the degree of severity of the defendant's conduct, Florida courts have held that liability for intentional infliction of emotional distress is found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *McCarson*, 467 So.2d at 576 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  A defendant's conduct is deemed intentional where the defendant "knows that such distress is certain, or substantially certain, to result from his conduct . . . ."  *McCarson*, 467 So.2d at 576 (quoting Restatement (Second) of Torts § 46 cmt. i (1965)).

The elements are ably satisfied in this case.  First, defendants Iran, MOIS, and the IRGC provided material support to Saudi Hezbollah with the intent that Saudi Hezbollah would carry out attacks that would cause severe emotional distress.  Second, the tragic bombing of the Khobar Towers by means of material support and civil conspiracy is an act that is nothing short of extreme, outrageous, and beyond all bounds of civil decency.  As is the nature of terrorism, terrorists seek to perform acts that are deliberately outrageous and bring about extreme suffering in order to achieve political ends.  Third, defendants' actions in facilitating and supporting the Khobar Towers bombing proximately caused Mr. Blais' emotional distress because the material support and direction given to Saudi Hezbollah ensured the event would occur.  Finally, the evidence shows that Mr. Blais suffered emotional distress, and that his emotional distress was severe.

D.     *Plaintiffs Curtis and Maria Taylor's Claims*

1.     *Intentional Infliction of Emotional Distress*

Plaintiffs Curtis and Maria Taylor, Mr. Blais' stepfather and mother respectively, bring a

claim for intentional infliction of emotional distress.  The Commonwealth of Virginia recognizes

the tort of intentional infliction of emotional distress.  *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va.

2006).  Similar to Florida law, intentional infliction of emotional distress is met in Virginia if:

"(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and

intolerable; (3) there was a causal connection between the wrongdoer's conduct and emotional

distress; and (4) the emotional distress was severe."  *Id.*  Virginia also recognizes this tort even if

the plaintiff suffers no actual physical injury, provided the four elements of the tort are satisfied.

*Womack v. Eldridge*, 210 S.E.2d 145, 147-48 (Va. 1974).[7]  In addition, a parent may recover for

severe emotional distress resulting from defendant's outrageous and offensive conduct toward a

child, even if the parent was not present during the outrageous conduct.  *Morgan v. Foretich*, 846

F.2d 941, 950-51 (4th Cir. 1987) (applying Virginia state law, and holding that *Womack* does not

require a parent to be present during defendant's outrageous conduct in order to recover for

intentional infliction of emotional distress).

  Here, the elements of plaintiffs' intentional infliction of emotional distress claim are met.

As previously noted, defendants Iran, MOIS and the IRGC's conduct in providing material

support and facilitation to bring about the Khobar Towers bombing was both intentional, as well

---

  [7] Central to this holding appears to be the notion that the defendant's tortious conduct
was conducted with the intent to bring about severe emotional distress in the plaintiff.  As this
Court has previously held, terrorist attacks such as the attack on the Khobar Towers are aimed at
creating emotional distress in the victims' families as well as in the victims themselves.
*Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 283 (D.D.C. 2005) (Bates, J.)
(citing *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates,
J.).  In fact, this Court noted in *Dammarell* that, under Virginia law, emotional distress resulting
from a "non-tactile tort" may be compensated if the plaintiff alleges, and proves by clear and
convincing evidence, that the elements of intentional infliction of emotional distress have been
met.  *Dammarell*, 404 F. Supp. 2d at 296 (quoting *Russo v. White*, 400 S.E.2d 160, 162 (Va.
1991).  Accordingly, it stands to reason that plaintiffs Curtis and Maria Taylor are not precluded
from bringing a claim for intentional infliction of emotional distress notwithstanding the fact that
they did not suffer an actual physical injury.

as extreme and outrageous.  The horrific act precipitated by the defendants' planning and assistance brought immediate emotional distress to the plaintiffs because, for a period of three days, they did not know whether their son had survived the attack.  The evidence shows that plaintiffs have continued to experience emotional distress since that time because they have had to care for Paul Blais, and live with the harsh reality that this attack has dashed his hopes of ever leading a normal life.

*IV.     Damages*

To obtain damages against defendants under the FSIA, the plaintiffs must prove that the consequences of the defendants' conduct were "reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages."  *Salazar*, 370 F. Supp. 2d at 115-16 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted).

*A.     Compensatory Damages*

As a result of the wrongful conduct of defendants Iran, MOIS, and the IRGC, plaintiffs have suffered and will continue to suffer pain and mental anguish.  Under the FSIA, if a foreign state may be held liable, it "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  Accordingly, plaintiffs are entitled to the typical bases of damages that may be awarded against tortfeasors under the laws of Florida and Virginia.[8]

In determining the appropriate amount of compensatory damages, the Court may look to

---

[8] Plaintiff Paul A. Blais' compensatory damages will be determined under Florida law because he was domiciled in Florida at the time of the attack, while Plaintiffs Curtis and Maria Taylor's compensatory damages will be determined under Virginia law.

prior decisions awarding damages for pain and suffering, and to those awarding damages for

solatium.  *Prevatt*, 421 F. Supp. 2d at 160.  "While intervening changes in law have ruled many

cases' reliance on federal common law improper, such findings need not disturb the accuracy of

the analogy between solatium and intentional infliction of emotional distress."  *Haim*, 425 F.

Supp. 2d at 71.

> 1.      *Plaintiff Paul A. Blais' Compensatory Damages*
>
> a.      *Battery*[9]

Under Florida law, upon a finding that defendant has committed tortious battery, a court

may award damages for injuries as well as pain, humiliation, embarrassment and mental

suffering when "they are a sequel to physical punishment."  *Glickstein v. Setzer*, 78 So.2d 374,

375 (Fla. 1955); *see also Smith v. Bagwell*, 19 Fla. 117 (Fla. 1882) (holding in a tortious battery

case that a jury instruction was proper that instructed the jury to consider expenses, time and

bodily pain and suffering arising from the injury).

With respect to natural damages resulting from the attack, this Court finds that Mr. Blais

is entitled to recover damages for past and future wages lost as a result of being unable to

continue to perform his job as a pilot.  Based on the evidence presented to the Court, Mr. Blais is

entitled to recover compensatory damages from defendants for both direct injuries and pain and

suffering resulting from the defendants' tortious misconduct.  With respect to lost wages, Mr.

Blais has demonstrated via an economic expert that, as a result of the bombing, Mr. Blais

suffered $1,801,792 in economic losses, specifically in lost wages and benefits.

With respect to pain and mental anguish damages, the Court admits that assessing the

---

[9] Because Mr. Blais can recover for his mental anguish under his battery claim, the Court
need not consider his intentional infliction of emotional distress claim, which would result in an
impermissible double recovery.

amount of compensatory damages for pain and suffering due an injured plaintiff is undeniably difficult.  This Court has, however, established a general framework for making such a determination.  In cases that involve an attack where the victim survives, and where no captivity occurred, courts typically award a lump sum award based in large part on an assessment of the following factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."  *Id.* at 73.

In one such case, *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1 (D.D.C. 2001) (Bryant, J.), a survivor of a passenger bus bombing was awarded $12 million for past and future pain and suffering.  The Court arrived at this figure in light of the fact that the victim was injured to make a political statement, and because she spent four weeks in the hospital, nine additional days in a rehabilitation center and three months receiving continued treatment after her release. *Id.* at 5-6.  Further, the victim suffered several severe permanent maladies, including, *inter alia*, complete deafness, blindness in one eye, and disfigurement.  *Id.* at 12-13.  Similarly, in *Campuzano* this Court, following *Mousa*, granted a surviving victim with similar injuries a $17 million award on the grounds that the plaintiff  remained in the hospital for two weeks longer than Ms. Mousa, and the plaintiff's injuries were "slightly more serious" than hers.  *Id.* at 274. Comparing the factors to the injuries in *Haim*, this Court awarded an injury victim of a suicide bombing $11 million on the grounds that the victim was hospitalized for less than four weeks and because the victim's injuries were less severe than those of either Ms. Mousa or Ms. Campuzano.  *Haim*, 425 F. Supp. 2d at 73-75.

Applying the considerations set forth in the *Haim*, *Mousa*, and *Campuzano* cases, the Court finds that Mr. Blais was severely injured by the tragic attack on the Khobar Towers.  Mr.

Blais was in a coma as a result of the attack, and then a vegetative state for approximately five weeks.  Tr. 47-48; Ex. 16 at 2.  Mr. Blais suffered severe brain trauma and deprivation of oxygen, and had to be given a tracheotomy in order to enable him to breathe.  Ex. 16 at 2; Tr. 49. As a result of the trauma to his brain, Mr. Blais suffered diminished motor skills, short term memory impairment, and has had trouble writing and reading.  Ex. 16 at 3; Tr. 52.  In total, Mr. Blais was hospitalized for a period of nearly four months, and has continued to receive medical treatment and rehabilitation since that time.  Ex. 16 at 2.  Even now, despite his best efforts at rehabilitating his injuries, Mr. Blais' daily functions remain woefully impaired; he continues to have trouble with his speech, balance, and coordination.  Ex. 16 at 3.

Taking all of these factors into account, this Court finds that Paul A. Blais is entitled to an award of $21,801,792 for his lost wages, and for the pain and mental anguish Mr. Blais felt and continues to feel as a result of the battery brought about by the defendants.

2.      Plaintiffs Curtis and Maria Taylor's Compensatory Damages

a.      Intentional Infliction of Emotional Distress

In determining the amount of compensatory damages awards to family members of a surviving victim, this Court has held that these awards are determined by the "nature of the relationship" between the family member and victim, and "the severity of the pain suffered by the family member." *Haim*, 425 F. Supp. 2d at 75.  Parents of victims typically receive smaller awards than spouses, but receive larger awards than siblings.  *Id.*  Moreover, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Id.*

Applying the approach adopted in *Haim*, this Court finds that Mr. and Mrs. Taylor suffered in many of the same ways the father in *Haim* suffered as a result of his son's debilitating

injuries.  As in *Haim*, the Taylors experienced anguish when they first heard about the attack and in the three days thereafter when they did not know whether their son was dead or alive.  Tr. 84-85.  Similarly, as in *Haim*, the Taylors relationship with Mr. Blais has changed drastically.  Mr. Taylor gave up his job so that he and Mrs. Taylor could move in with Mr. Blais to be at his side throughout his rehabilitation process.  Tr. 89, 100.  Since that time, the Taylors have tirelessly devoted themselves to their son's rehabilitation, with Mrs. Taylor acting as Mr. Blais' full-time caretaker and nurse.  Tr. 124, 135.   Throughout this process, both Mr. and Mrs. Taylor have experienced a great deal of emotional distress as a result of seeing their son in such a state.  Tr. 100, 124-25, 143-44, 145.

In light of the similarities between the Taylors' suffering and anguish and that of the father in *Haim*, it stands to reason that the amount of damages the Taylors may recover should parallel those in *Haim*.   In *Haim*, the victim's father received $3.5 million for his mental anguish and suffering.  *Haim*, 425 F. Supp. 2d at 75.  Likewise, here Mr. and Mrs. Taylor should each receive $3.5 million for the mental anguish and suffering they felt and continue to feel since the day of the attack in 1996.

B.     *Punitive Damages*

Punitive damages are not available against foreign states.  28 U.S.C. § 1606.  Additionally, punitive damages are not recognized against divisions of a foreign state that are considered to be the state itself, instead of an agent or instrumentality thereof.[10]  For punitive damages purposes, the court must consider the core functions of the entity. *Roeder*, 333 F.3d at 234.  Entities that are governmental are considered a part of the foreign state itself, while

---

[10] *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 161 (D.D.C. 2006) (Lamberth, J.) (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 222, 234 (D.C. Cir. 2003).

commercial entities are deemed agencies or instrumentalities of the foreign state, and thereby subject to punitive damages. *Id.*

Plaintiffs concede that punitive damages are not available against defendant Iran, but argue they should be available against the IRGC as an agent or instrumentality of Iran. Plaintiffs allege that the evidence in the case supports the finding that the IRGC has no legitimate governmental functions. They point to evidence that the IRGC is the military arm of the Ayatollah and mullahs who control Iran, that it receives separate funding from the former Shah's confiscated assets, and that it can best be analogized to a group of thugs considered the muscle of those in power in Iran. Notwithstanding these facts, plaintiffs concede that this evidence does not affirmatively demonstrate that the IRGC has any commercial functions under the *Roeder* standard, but they argue that the IRGC should nonetheless be held liable for punitive damages.

This Court is not convinced. In previous cases, this Court has repeatedly held that the IRGC is governmental and not commercial, and therefore not subject to punitive damages.[11] In each of these cases, plaintiffs' attempts to obtain punitive damages against the IRGC failed because plaintiffs in those cases did not provide sufficient *affirmative* evidence that the IRGC was commercial. The present case is no different. Plaintiffs cannot establish the IRGC as commercial based upon such an unfounded negative implication. Therefore, this Court lacks authority to grant plaintiffs' request for punitive damages against the IRGC because it is a governmental entity, and a part of the state of Iran itself. Accordingly, plaintiffs' claim for punitive damages is denied.

---

[11] *Prevatt*, 421 F. Supp.2d at 162; *Holland, et al. v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 40254, Civ. A. No. 01-1924 (CKK) (D.D.C. 2005) (Kollar-Kotelly, J.); *Salazar*, 370 F. Supp. 2d at 116; *Welch v. Islamic Republic of Iran*, 2004 U.S. Dist. LEXIS 19512, 2004 WL 2216534 (D.D.C. 2004) (Kay, J.)

## CONCLUSION

This Court takes note of plaintiffs' courage and steadfastness in pursuing this litigation and their efforts to take action to deter more tragic suffering of innocent Americans at the hands of terrorists.  Their efforts are to be commended.

A judgment consistent with these findings shall issue this date.

SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, September 29, 2006.